**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| INTERCONTINENTAL GREAT BRANDS LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE PARTNERSHIPS AND UNINCORPORATED ASSOCIATIONS IDENTIFIED IN SCHEDULE "A", <br><br> Defendants. | No. 2:26-cv-00248 |

**DECLARATION OF JAMES E. JUDGE**

I, James E. Judge, of the City of Chicago, in the State of Illinois, declare and state:

1.     I am an attorney at law, duly admitted to practice before the Court of the Northern District of Indiana. I am one of the attorneys for Intercontinental Great Brands LLC ("Plaintiff"). Except as otherwise expressly stated to the contrary, I have personal knowledge of the following facts and, if called as a witness, I could and would competently testify as follows:

2.     In my experience in combating online counterfeiting and infringement over the last four years, I have observed counterfeiters and infringers using a variety of tactics to evade enforcement efforts. In particular, counterfeiters or infringers like Defendants in the present case will often register new e-commerce stores under new aliases once they receive notice of a lawsuit.

3.     In my experience, the procedures that platforms currently have in place fall abundantly short of stopping present infringement and deterring repeat infringers from relisting their counterfeit products.

1

4.     On information and belief, platforms have a simplified process for reusing, relisting, and modifying listings by storing the listings and their related images in their databases. This allows sellers to easily reuse old templates of infringing listings under new product IDs.

5.     In my experience, platforms put little effort into preventing serial intellectual property infringement. In other words, platforms fail to stop repeat infringers, who establish new storefronts, from operating despite having the technology to detect familiar IP addresses.

6.     In most instances, sellers must provide an e-mail address to third party online marketplace platforms such as Alibaba, AliExpress, Amazon, eBay Etsy, Fruugo, Shein, Shopify, and Walmart, as well as the payment processors such as PayPal, Stripe, Payoneer, and LianLian when registering their accounts.

7.     Little appears to be done by the platforms to verify that the contact information associated with a seller is legitimate, pursuant to the INFORM Consumers Act.[1] In my experience, nearly all physical mailing addresses provided by foreign-based sellers are entirely fabricated. This is a result of a lack of due diligence on the platforms' part in verifying the physical address and/or the sellers themselves not meeting the criteria to be subject to the INFORM Consumers Act. Upon information and belief, infringers often operate multiple smaller stores under various seller aliases to split their sales numbers and gross revenue between these stores and thereby evade having to comply with the INFORM Consumers Act.

---

[1] The INFORM Consumers Act, 15 U.S.C. 45f (effective June 27, 2023), imposes obligations on online marketplaces regarding the collection, verification, safeguarding, and disclosure of certain information of high-volume, third party-sellers that sell, offer to sell, or contract to sell new or unused consumer products in the United States through marketplace platforms. The marketplaces must disclose in either product listing pages, confirmation pages, or account transaction histories the sellers' names, mailing addresses, and contact information if the seller has, in the last twenty-four months and during a continuous twelve-month period, had at least two hundred sales or transactions and $5,000 or more in gross revenues.

2

8.      However, the platforms usually verify the email addresses provided by the sellers. E-mail address verification is typically a straightforward process where the third-party online marketplace platforms send an e-mail to the provided e-mail address and require the user to respond by clicking a link in the e-mail. By contrast, any verification that may occur for physical addresses is likely not as reliable as e-mail address verification. Since an e-commerce store operator can input any physical address, such addresses may be incomplete, false and/or are not where the e-commerce store operator is located.

9.      In addition, e-commerce store operators must provide a valid e-mail address to customers for completing payment and/or managing their e-commerce stores. As such, counterfeiters and infringers rely primarily on electronic communications to communicate with the platforms and customers.

10.      Admittedly, every platform has some sort of takedown procedure in place. However, most of these procedures are flawed in that they have lengthy processing times, gatekeep smaller brands and/or sellers who have design patents and copyrights, but not trademarks, from enforcing their rights, and are riddled with loopholes.

11.      Amazon's Brand Registry, for example, primarily accepts requests pertaining to trademark infringement and only does so on weekdays. Consequently, counterfeiters intentionally list products on Fridays to make as many sales as possible during peak shopping days (i.e., Saturdays and Sundays) and even an additional day or two before Amazon's staff can address rights owners' takedown requests.

12.      Similarly, sellers who submit takedown requests to Alibaba typically must wait four to five days for a response from the platform. The turnaround time for takedown requests is also often extended to weeks when there is a holiday in China and Alibaba's offices are

presumably closed. This results in weeks of infringing activity that sellers with protected intellectual property have no way of stopping.

13. Takedown measures related to design patent or copyright infringement are much more limited than for trademarks. For example, Amazon launched a program called "Project Zero," which allows for merchants who have a (1) registered trademark and (2) have submitted reports of potential infringements through Amazon's "Report a Violation" tool with an acceptance rate of at least 90% over the last six months to have any infringing listings removed without the platform's involvement. *Project Zero FAQ*, AMAZON, https://brandservices.amazon.com/projectzero/faq (last visited May 20, 2024). Realistically, having a 90% acceptance rate is almost impossible for brands that face daily high-volume counterfeiting and inevitably have a fraction of their takedown requests rejected.

14. Further, Amazon's Transparency program, a product authenticity verification tool, is another example of gatekeeping intellectual property rights enforcement from smaller brands and copyright/design patent holders. To be eligible, sellers must have (1) a registered trademark, (2) global trade item numbers (GTINs), such as a UPC, ISBN, or EAN, for their items, and (3) the ability to apply unique Transparency codes to every unit of their manufacture. *Transparency,* AMAZON, https://brandservices.amazon.com/transparency (last visited Nov. 13, 2023). Again, this program is not available to design patent or copyright holders. More importantly, it is completely out of reach to smaller sellers and brands who lack the resources to set up GTINs for their products to in turn take advantage of the Transparency program. Instead, these small sellers must resort to the traditional, time-consuming, and tedious takedown procedures.

15. In sum, smaller brands and mom-and-pop stores operating online are condemned to the Sisyphean task of submitting takedown requests to platforms that may or may not be approved and playing an infinite, frustrating game of whack-a-mole with counterfeiters who never cease to create new infringing listings. To have a robust enough system within a company that can keep up with reporting the high volume of new infringing listings, businesses must hire new employees to perform this function or pay separate third-party services whose specialty it is to submit these reports. Any effective takedown procedure or service is often cost-prohibitive to small businesses.

16. Legitimate sellers' frustration with the ineffective nature of platforms' takedown procedures, rapidly appearing infringing listings, the completely nebulous identities of their counterfeiters, and the immense cost of implementing an expansive takedown system internally has drawn sellers to litigation against multiple defendants.

17. Such litigation appears to be the only means for smaller business to enforce their intellectual property rights, legitimately gain the infringers' attention through an asset freeze, and, most importantly, manage to keep their businesses afloat without drowning in intellectual property enforcement costs.

18. Based on my research, there is no treaty between the United States and China establishing recognition of judgments from United States courts in China.

19. Nonetheless, counterfeiters or infringers like Defendants monitor PACER for new federal filings before an *ex parte* TRO can be imposed or service can be effectuated.

Pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct to the best of my knowledge, information, and belief, and that I signed this declaration on the date set forth below.

5

Dated: May 28, 2026

/s/ James E. Judge
JAMES E. JUDGE
Attorney for Plaintiff